ORIGINAL

*IN THE UNITED STATES COURT OF FEDERAL CLAIMS*

FILED
JUN 30 2008
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **TIMOTHY W. KAHN,** | ) | |
| | ) | |
| ***Plaintiff,*** | ) | |
| | ) | |
| **vs.** | ) | **NO.:** 08-476 C |
| | ) | |
| **THE UNITED STATES,** | ) | Judge ________ |
| | ) | |
| ***Defendant.*** | ) | |
| | ) | |

COMPLAINT

***Jurisdiction***

1. The Court has jurisdiction under 28 U.S.C. § 1491(a) (1) and (2). The action seeks a judgment against the United States for Public Health Service ("PHS") back pay and allowances, retired pay, and ancillary relief.

2. The money mandating statutes are 42 U.S.C. § 213(a)(2); 37 U.S.C. §204; 10 U.S.C. § 1203. The claims also rest on the PHS Commissioned Corps Personnel Manual ("CCPM"), Subchapter CC 25.1, Instruction 1, Section C(2), Subchapter CC 23.8, Personnel Instruction 6, Section C, Subchapter CC 43.8, Section G(1), G(3) Subchapter CC 49.3, Instruction 1, Subchapter CC Section 23.6, Instruction 4.

///

### *The Parties*

3. Plaintiff Timothy W. Kahn resides at 211 Grand Avenue, No. 209, Long Beach, CA 90803. While serving as a Lieutenant (Junior Grade) ("LTJG") in the PHS Commissioned Corps, he was retaliated against for reporting unlawful prescribing of medications in violation of Drug Enforcement Administration ("DEA") regulations, federal statutes and patients civil rights and for filing Equal Employment Opportunity ("EEO") complaints.

4. Defendant is the United States of America.

### *Statute of Limitations and Exhaustion of Administrative Remedies*

5. On or about June 27, 2005, pursuant to 10 U.S.C. § 1552(a) and 10 U.S.C. § 628(b)(1), Plaintiff submitted an application to the PHS Board for Correction of Commissioned Corps Records ("BCCCR") with a request for relief, at times herein referenced as the Board of Corrections of Military Records ("BCMR"). On or about March 28, 2007, the BCCCR denied Plaintiff's application.

### *Statutory and Regulatory Framework*

6. The PHS Commissioned Corps is a uniformed service. 37 U.S.C. § 101(3).

7. Commissioned Corps officers, including probationary officers, 42 U.S.C. § 210, have a statutory entitlement to pay (37 U.S.C. § 204(a)(1)).

8. The Commissioned Corps Personnel Manual ("CCPM"), Part 2, Subchapter CC 23.7, Personnel Instruction 1, governs the involuntary separation of active duty reserve corps officers. These provisions implement 42 U.S.C. § 209. Section D, Paragraph 1, provides that:

> "[a]t any time during the probationary period, an officer may be separated from active duty for reasons including, but not limited to, the following: (1) abolishment of an officer's position....; (2) unsuitability...; (3) failure to demonstrate the level of performance, conduct, dedication to duty, or professional attitude and attributes expected of an officer in the uniform services; (4) refusal to accept reassignment; or (5) unsatisfactory conduct before call to active duty..."

9. Discrimination and reprisal are not legitimate grounds for involuntary separation of probationary officers. CCPM, Part 4, Subchapter CC 46, Personnel Instruction 1, Section E, provides that:

> "[e]very officer or applicant shall be free from any and all restraint, interference, coercion, or reprisal on the part of fellow officers or employees, supervisors, or other management officials in lodging any allegation relating to discrimination, filing or pursuing any complaint or appeal, appearing as a witness or serving as a representative or as an advisor to a complaint, or other action related thereto."

10. 42 U.S.C. § 213(a)(2) and 10 U.S.C. § 1203 provide for disability compensation for active duty members of the Commissioned Corps. CCPM,

Subchapter CC 23.8, Personnel Instruction 6, Section C, provides that:

> "[a]ll officers, reserve or regular, serving on active duty are covered by the above indicated disability retirement provisions with the exception of commissioned officers student training and extern program (COSTEP) and senior COSTEP participants who are excluded from disability retirement under section 221a(2) of the PHS 42 U.S.C. 213(a)(2)."

11. CCPM, Subchapter CC 43.8, Section G(1), provides that:

> "[a]n officer may be considered for disability retirement with or without a specific application from the officer for such retirement. All such cases shall be referred to a medical review board (and such subboards as deemed necessary) established pursuant to regulations contained in subchapter CC 49.3, instruction 1, of this Manual."

12. Subchapter CC 49.3, Instruction 1, further provides that:

> "[t]he Surgeon General (SG) shall appoint medical review boards as necessary to review the case of any officer who may be entitled to retirement due to physical disability, in the case of any officer whose name has been placed on a temporary disability retirement list and who is required to undergo a periodic physical examination, and the case of any officer who, after his appointment in the regular corps, or called to active duty in the reserve corps, is required to undergo a physical examination, the results of which indicate a possible physical disqualification for further service."

13. CC 29.3, Section D(3) (a) provides that:

> "Officers should notify MAB immediately of any significant change in health status occurring after the separation examination which effects their fitness for duty."

14. CCPM, Subchapter CC 29.3, Section C(3), provides that:

"MAB is responsible for the review, evaluation, and coordination of an officer's latest medical examination with previous examinations and other medical data maintained by this branch in the officer's central medical file.

This office is also responsible for the determination of physical qualifications of all applicants to the commission corps."

15. CCPM, Subchapter CC 29.3, Section D(4), provides that:

"Because of the possibility of medical separation, these officers usually will be receiving a thorough examination which will serve as a separation examination which will be reported to the PHS Medical Review Board (MRB). However, these officers should assure that their central medical files contain documentation of any conditions which they wish to bring to the attention of the MRB and/or the VA, and that they have attained indicated screening for asymptomatic, undetected disease before their medical separation dates."

16. CCPM, Subchapter CC 26.1, Instruction 1, provides in Exhibit "I" of its Code of Ethics for Government Service that:

"any person in Government Service should:

II. "Uphold the Constitution, laws, and legal regulations of the United States and all governments therein and never be a party to their evasion." and

IX. "Expose corruption wherever discovered."

17. The Commissioned Officers' Handbook that governs Commissioned Corps officers states at page 52 ¶ 10, "PHS Officers must use information received

in the course of meeting the responsibilities to advance public purposes."

18. Commissioned Corps officers' records are subject to correction for error or injustice by the civilian ("BCMR"), under Section 221a(a)(12) of the PHS Act. 42 U.S.C. § 213a(a)(12) (extending correction of military records provisions of 10 U.S.C. § 1552 to

Commissioned Corps personnel).

19. Under 10 U.S.C. § 1552(g), the term "military record" means a document or other record that pertains to (1) an individual member or former member of the armed forces, or (2) at the discretion of the secretary of the military department concerned, any other military matter affecting a member or a former member of the armed forces, an employee or former employee of that military department, or a dependent or current or former spouse of any such person. Such term does not include records pertaining to civilian employment matters, such as matters covered by Title V and Chapters 81, 83, 87, 108, 373, 605, 607, 643, and 873 of Title 10, U.S. Code.

***Statement of Facts***

***A. Career Performance***

20. After serving in the United States Army where he received an Army Achievement Medal (for exceptionally meritorious service), LTJG Kahn was

commissioned as an officer in the PHS on July 26, 1999, on conditional release from the Army.

21. LTJG Kahn was initially assigned to the Colorado River Service Unit, Parker Indian Hospital, Parker, Arizona as a clinical nurse where he served from August 1, 1999 to September 1, 2001.

22. While detailed to Parker Indian Hospital, he was awarded the PHS and Indian Health Service ("IHS") Exceptional Performance Award on October 26, 2000 and was recommended for promotion to the rank of Lieutenant because of his exceptional capability in January 2001.

23. In December 2000, LTJG Kahn was diagnosed with a herniated disk (L4-L5) in his back, which had in some measure affected his ability to perform his job duties.

24. In late March 2001, LTJG Kahn reported to his supervisor that a physician at Parker Indian Hospital was illegally prescribing medications to patients in contravention of DEA regulations and federal statutes, and that patients' civil rights had been violated.

25. Despite his physical hardships dues to his herniated disk, LTJG Kahn was awarded the Chief Nurse Officer's Award in May 2001 for his recognition of outstanding contributions to nursing.

26. On June 29, 2001, three months after making the complaint against the physician at Parker Indian Hospital, LTJG Kahn again reported to his supervisor that the same physician was continuing to prescribe medications in a highly questionable manner. He did so because no action had been taken to address the matter.

27. On August 6, 2001, LTJG Kahn was awarded the PHS Unit Commendation for exemplary performance of Duty.

28. On September 1, 2001, LTJG Kahn was transferred to Division of Immigration Health Services ("DIHS"), San Pedro, California.

29. In Mid-October 2001, his treating physician, Dr. Smart-Abbey, diagnosed LTJG Kahn with a worsening back condition; LTJG Kahn then suffered from multiple herniated disks (L4-L5 & L5-S1).

30. While LTJG Kahn continued to work, missing only one day of work for more than a month, on November 28, 2001, he was placed on bed rest for two weeks with home traction.

31. During this period, LTJG Kahn learned that no action had been taken to address the DEA violations at Parker Indian Hospital. On November 6, 2001, LTJG Kahn forwarded a copy of his complaint with supporting documentation, which he by accident had retained, to the Service Unit Director, Parker Indian

Hospital. In doing so, LTJG Kahn was advised that he followed proper protocol.

32. In a letter, dated 5 December, 2001, from Capt. Hooper, Senior Medical Evaluations Officer, he wrote that a request from LTJG Kahn's program was made for a "fitness for duty" evaluation, and that LTJG Kahn's was required to submit all his medical records for the past 12 months. He also stated that after LTJG Kahn's surgery, if LTJG Kahn's exceeded the allowable days of sick leave, that LTJG Kahn's case would have to be presented to Medical Review Board. At the time this was written, LTJG Kahn's was on sick leave for four working days that started on 11/28/01, when LTJG Kahn's Neurosurgeon wrote an order that LTJG Kahn be off work for two weeks on bedrest & home traction. It had not been determined if LTJG Kahn would need surgery or not, that is why palliative treatment & home traction was ordered in hopes that his discs would slip back into place. Up to that time, LTJG Kahn did not use, but one day of sick leave since his transfer to DIHS at San Pedro. In her affidavit, in response to LTJG Kahn's EEO complaint(s) of discrimination, CDR Anthony utilized a three page affidavit to substantiate her request for the fitness for duty evaluation. In subsequent documentation in the EEO investigation, it was found that CDR Anthony utilized an altered "leave request form" to substantiate her affidavit, which LTJG Kahn acquired forensic documentation evidence to prove this document had been altered.

She later recanted that she ever order a fitness for duty request.

33. On December 6, 2001, LTJG Kahn was ordered by his supervisor, CDR Alyssie Gordon, PHS, to phone the unit each morning.

34. Because he was being singled out unfairly to call in each morning and to undergo a fitness for duty examination, despite missing a short period of time from work, LTJG Kahn filed an EEO complaint on December 10, 2001.

35. The EEO officer advised LTJG Kahn, contrary to agency regulations, that his case would first have to be considered under the agency's Alternative Dispute Resolution Program.

36. In a January 7, 2002 letter, the Service Unit Director, Parker Indian Hospital, advised LTJG Kahn that he was investigating the physician in question and thanked him for bringing the matter to his attention.

37. On January 15, 2002, CDR Cheryl Chapman, PHS, telephoned LTJG Kahn and threatened him that he should withdraw his EEO complaint. She also advised him that she "remembered him from Parker Indian Hospital," and inquired about his recommended promotion (the promotion was entered into LTJG Kahn's Electronic Officer Performance File ("OPF") on January 7, 2002 more than six months after the promotion recommendation, but was never approved).

38. On February 15, 2002, LTJG Kahn filed a formal complaint with

Patricia Mackey, Director, Office of Equal Opportunity and Civil Rights, Health Services and Resources Administration. This complaint was accepted one week later.

39. In a March 7, 2002 letter from the IHS Field Operations Officer, Don J. David, LTJG Kahn was ordered to return copies of all documents he had retained regarding the complaint he made against the physician at the Parker Indian Hospital. LTJG Kahn immediately complied with the directive.

40. In March 2002, faced with a threat of reprisal from a PHS officer in Washington, and medical bills that were clearly authorized to be paid, but were not paid, and repeated admonishments by the head of the Medical Affairs Branch to document what clearly was a worsening back condition, LTJG Kahn filed three EEO complaints on the grounds of retaliation.

41. In an April 5, 2002 letter, the Medical Affairs Branch chief, David G. Hooper, CAPT, PHS, advised LTJG Kahn that "if by the time of his next appointment you are not released to full duties, or with minimal accommodative limitations, your case may be presented to the next Medical Review Board. If a copy of your next office visit is not received within the time requested then I will have to assume you have not been returned to full duty. The MRB will review what records have been submitted and arrive at their determination based on the

available evidence. If the results are adverse to you based upon your refusal to cooperate, then you will need to deal with the consequences." In a sworn affidavit, CAPT Hooper later denied that he had advised Kahn in this manner.

42. CAPT Hooper's statement was inconsistent. In a March 28, 2002 memorandum, CAPT Hooper acknowledged receiving current medical records that documented LTJG Kahn's physical condition, yet he continued to admonish him to provide current clinical information." Again in a March 23, 2002 memorandum, CAPT Hooper acknowledged receiving current treating records.

43. In any event, LTJG Kahn continued to forward documentary evidence of his worsening condition, but because of logistical problems with his physician's office, which was understaffed, his medical records at all times were not immediately available and his ability to acquire the records within the time allotted was not within his control.

44. During this period, CAPT Hooper, however, imposed a new order upon LTJG Kahn to have all medical evidence to him within 72 hours of each appointment or medical consultation.

45. On April 19, 2002, an Air Force physician found that LTJG Kahn was not fit for duty and should be medically processed pursuant to agency regulations.

46. In a May 14, 2002 letter, the Director, Division of Commissioned

Personnel, R. Michael Davidson, RADM, PHS, advised LTJG Kahn that he was being terminated because he had violated the Privacy Act by retaining and disseminating patient records. That same day, CAPT Hooper found that, despite the recommendation of the Air Force Primary Care physician who opined that LTJG Kahn should be medically processed, "no evidence warrant[ed] presentation to PHS Medical Review Board ("MRB")". He also wrote a letter to Dr. Smart-Abbey on the 23rd of April, requesting that he change his wording on his medical release because LTJG Kahn's Primary M.D. wrote a stricter report supporting LTJG Kahn's medical condition. Also, Dr. Smart-Abbey did see the copy of LTJG Kahn's Primary M.D.'s report before writing his report.

47. On May 31, 2002, LTJG Kahn responded to the allegations, asserting that his retention of the records did not violate the Privacy Act, nor did it warrant termination, as he had disseminated the records to report on a physician who was violating federal law, and, more importantly, was threatening the welfare of patients. LTJG Kahn also complained to the EEO director that his termination was in reprisal for his lawful action of filing an EEO complaint.

48. On or about May 30, 2002, LTJG Kahn re-injured his back and his primary care M.D. wrote a profile which stated that he should only go "back to work as tolerated" effective from June 4, 2002 through July 4, 2002.

49. Even though LTJG Kahn's ongoing back pain was acknowledged on March 15, 2002 by Dr. Smart-Abbey, on June 26, 2002, LTJG Kahn, continuing to suffer from lower back pain, was diagnosed with Syringomyelia by Richard Allen, M.D., a neurosurgeon. LTJG Kahn faxed a letter to the MAB on June 26, 2002 advising that Dr. Allen could not complete his separation physical until the information requested in the referral was obtained.

50. Notwithstanding his physical debilitating condition, and despite having an excellent record that detailed his outstanding contribution to the PHS, and while Defendant was in possession of records pertaining to LTJG Kahn's medical condition, LTJG Kahn was honorably discharged on June 30, 2002.

51. In the interim, each of the EEO complaints stagnated over a period of months with little or no investigation completed, despite each being substantiated, in violation of USPHS policy.

52. Further LTJG Kahn had provided a request that he be released back to the U.S. Army pursuant to Department of Defense Directive 1300.4, which Defendant failed to do.

53. LTJG Kahn discovered that relevant documents regarding his separation existed but were never released to him and on November 1, 2004, LTJG Kahn filed a Complaint in the U.S. District Court, Central District of California,

case number CV 04-9040 NM (CWx), brought under the Freedom of Information Act, 5 U.S.C. section 552, to compel the release of documents identified by PHS. In these documents, the PHS claimed to have followed its own rules and regulations before terminating LTJG Kahn, which included:

(A) A memo signed by LCDR Parker dated July 18, 2002 referencing findings and/or minutes dated May 15, 2002 of the Medical Review Board relative to Plaintiff;

(B) Memoranda from CDR Tom Doss to CAPT Hooper dated May 3, 2002 addressing Plaintiff's medical condition;

(C) The Medical Review Board findings or action taken by the PHS when LTJG Kahn was completing his separation physical as well as LCDR Bernard Parker, M.D.'s order requesting further testing and a medical evaluation of Kahn referenced in the July 18, 2002 memo

(D) An investigation conducted by David A. Yost dated February 28, 2002, related to an investigation of LTJG Kahn; and

(E) An investigation conducted by Dr. Pond referenced in a February 8, 2002 letter from PHS to Robert A. Hallowell.

54. The PHS documents that reference Medical Board Review minutes regarding LTJG Kahn (as required) before his separation are noteworthy in that no Medical Board Review was ever conducted. PHS's response was that no such document existed and no separation physical was ever conducted before LTJG Kahn's separation.

***BCMR Decision***

55. On or about June 27, 2005, Plaintiff applied to the BCMR for correction of his record seeking the following relief:

A. The record should be corrected to show that LTJG Kahn was never separated.

B. LTJG Kahn should be promoted to the rank equivalent to his contemporaries forthwith.

C. LTJG Kahn should be fully reinstated and compensated for back pay and benefits attributable to his promoted rank.

D. LTJG Kahn has already presented himself to the Veterans Administration for VA compensation who gave him a rating of 60% disability which should be applied to the benefits to be received by him at his promoted rank.

E. LTJG Kahn should be retired at the promoted rank and be given a medical disability retirement at the maximum rate as reflected by his Veterans

Administration rating.

F. LTJG Kahn should be reimbursed for all attorneys' fees and costs relative to the wrongful separation.

G. LTJG Kahn should be awarded punitive damages.

56. On or about March 28, 2007, the BCMR denied the application and found in pertinent part as follows:

> "2. The application of Mr. Timothy W. Kahn was before the Board to determine if a material error or injustice occurred in the service records of the officer. Mr. Timothy W. Kahn is requesting 1) the record be corrected to show that he was never separated; 2) that he be promoted to the rank equivalent to his contemporaries; 3) that he be fully reinstated and compensated for back pay and benefits attributable to his promoted rank; 4) his VA disability rating of 60% should be applied to the benefits received by him at his promoted rank 5) he should be retired at the promoted rank and given a medical disability retirement at the maximum rate as reflected by his VA rating; 6) he should be reimbursed for all attorney's fees and costs relative to his alleged wrongful separation; and 7) he should be awarded punitive damages."
>
> "3. Mr. Kahn's first five requests are within the Board's authority to act upon. However, the sixth and seventh assertions that he is reimbursed for all attorneys' fees and costs relative to his alleged wrongful separation and he be awarded punitive damages are beyond the Board's legal authority.
>
> "4. Mr. Kahn's record indicates that he was terminated for cause under the probationary authority. At the time he separated, he was found fit for full duty and was not entitled to a disability retirement."

"5. Title United States Code, Section 209(a)(2) provides that reserve commissions 'may be terminated at any time, as the President may direct.' This authority has been delegated to the Director, Department of Commissioned Personnel (DCP). Secretarial regulation found at INSTRUCTION 1, Subchapter CC43.7, Section D (1), of the CCPM (Tab 2) states:

'The commission of any reserve corps officer on active duty may be terminated without cause at any time during the 3-year probationary period.'

Mr. Kahn was serving on probation at the time his commission was terminated. Because Mr. Kahn's commission was properly terminated, there is no basis for his request that his official personnel file be corrected to show he was never separated."

"6. Although the DCP has the authority to separate without cause during the probationary period, DCP found considerable cause to separate Mr. Kahn. The Director, Indian Health Service Field Operations (IHS) in a letter dated March 7, 2002, informed then LTJG Kahn that 'you have unlawfully copied and retained information from patient medical records from the Colorado River Service Unit. Possession of this information from our medical records without the consent of our patients is clearly a violation of the Privacy Act of 1974.' On May 14, 2002, The Director, DCP issued then LTJG Kahn a notice of Termination of Commission during the Probationary Period."

"7. The Medical Affairs Branch (MAB) began a series of contacts with Mr. Kahn to obtain information about and clarify his medical condition. They requested he submit his medical records for the past 12 months. Based on the medical evaluation reports submitted by military and private neurosurgeons, Mr. Kahn was determined by MAB to be medically fit for duty."

"8 Mr. Kahn was assigned to a medical facility of the Immigration and Naturalization Service (INS) in San Pedro, California. The board lacks jurisdiction over INS personnel activities. Since Mr. Kahn was not on the rolls of a PHS agency at the time of his separation, no PHS agency has a duty to reinstate the officer and give him back pay."

"9. Mr. Kahn's request he be promoted to the rank equivalent to his contemporaries is moot based on the termination of his commission on June 30, 2002. It is speculation that Mr. Kahn would have been promoted by a future promotion board had he remained on active service with the Public Health Service. Promotions are based on longevity and merit, are competitive and are also limited by the number of promotional openings available."

"10 The Board is denying Mr. Kahn's request to be fully reinstated and compensated for back pay and benefits which include his request his VA disability rating be applied. The Board found no error in the MAB evaluation. Mr. Kahn's treating surgeon wrote a letter to MAB stating the officer could return to regular work duties on April 22, 2002 with restriction of not lifting more than 50 pounds over the next three months. On May 3, 2002 the evaluation from the Naval Medical Center, San Diego, CA concluded that Mr. Kahn was fit for full duty. On June 30, 2002 Mr. Kahn ws terminated from duty."

"13 The Board found no merit to the claims Mr. Kahn presented. The members discussed the evidence provided by the Indian Health Service and found no error or injustice that was made towards Mr. Kahn. He was properly terminated under the Probationary Period. The Board therefore denies his request with prejudice."

57. The BCMR findings of fact were in error. LTJG Kahn was on PHS active duty and was not properly terminated. He did not unlawfully copy and retain information from patient medical records as he was under an ethical obligation to uphold the Code of Ethics for Government Service and to expose corruption

wherever discovered, and copied the records for this purpose only. His medical evaluations establishing that he had a medical condition and was not fit for duty prior to his separation was never considered by the MAB. He was never evaluated by the MAB with respect to his medical condition. Further, the MAB never determined LTJG Kahn to be medically fit for duty. The BCMR also failed to acknowledge that LTJG Kahn's primary MD apprised Capt. Hooper on April 19, 2002 that LTJG Kahn was not fit for duty due to his prescribed medications for ongoing back pain and that in his May 14, 2002 report, Capt. Hooper found that LTJG Kahn was fit for duty even though his prescribed medications had not changed.

## *Causes of Action*

## Count I

## (Wrongful Involuntary Termination and Reprisal)

58. The averments of paragraphs 1 through 57 are incorporated by reference as if fully set forth herein.

59. PHS is an agency which is bound by federal law and its own regulations, which prohibit retaliation against officers who have filed complaints and reported violations.

60. CCPM, Part 4, Subchapter CC 46, Personnel Instruction 1, Section E

provides that:

> "[e]very officer or applicant shall be free from any and all restraint, interference, coercion, or reprisal on the part of fellow officers or employees, supervisors, or other management officials in lodging any allegation relating to discrimination, filing or pursuing any complaint or appeal, appearing as a witness or serving as a representative or as an advisor to a complaint, or other action related thereto."

61. PHS has promulgated regulations within the CCPM, Part 2, which institute EEO policies and procedures, including CCPM Subchapter CC26.1 Personnel Instruction 1, Exhibit I and the U.S. Office of Special Counsel prohibiting personnel practices as defined by 5 U.S.C. Section 2302 (b).

62. PHS regulations prohibit reprisal against those who report unlawful activities and submit EEO complaints.

63. Defendant violated federal law when PHS retaliated against LTJG Kahn for reporting the unlawful conduct of a physician who was illegally prescribing medications and for filing EEO complaints; terminated his service without providing the basis for such action, and without affording him an opportunity to respond in accordance with the CCPM, which provides that Commissioned Officer Effectiveness Reports ("COER") be relied upon when evaluating officers for involuntary separation. Alternatively, Defendant's actions were arbitrary and capricious in that Defendants terminated his service, wrongfully asserting that he violated the Privacy Act when he was following his legal and

ethical obligations in acquiring documentation to substantiate unlawful conduct and activities.

## Count II

### (Wrongful Discharge–Medical Processing Required Under Federal Law)

64. The averments of paragraphs 1 through 57 are incorporated by reference as if fully set forth herein.

65. Under Federal law, Title 10, U.S. Code, Chapter 61, and Section 221 (a)(2) of the Public Health Service Act, PHS commissioned officers are entitled to be retired and compensated for service-connected disabilities.

66. Prior to being discharged, a member of the Commissioned Corps is entitled to an on-the-record hearing under 10 U.S.C. § 1214.

67. The processing of medical disability cases is governed by the CCPM, which requires the Chief of the Medical Affairs Branch to present all evidence of a debilitating condition to a Medical Review Board ("MRB").

68. In reprisal for reporting unlawful activities, and EEO Complaints, PHS officials did not present LTJG Kahn's case to the MRB, nor did they provide him with a required Fitness for Discharge physical in accordance with PHS regulations. Instead, without following its own regulations and considering all the medical evidence, PHS discharged LTJG Kahn, thereby terminating his pay and allowances.

///

## Count III

## (BCMR Decision Was Arbitrary and Capricious)

69. The averments of paragraphs 1 through 57 are incorporated by reference as if fully set forth herein.

70. The final agency decision on LTJG Kahn's BCCCR application was arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law because:

(1) LTJG Kahn did not violate the Privacy Act of 1974 as medical records of patients were never disseminated outside the PHS, were in possession of LTJG Kahn for the purpose of reporting unlawful activities, and were returned immediately upon request.

(2) LTJG Kahn was never evaluated by the MAB and the MAB never determined him to be medically fit for duty.

(3) The BCCCR never considered the injury LTJG Kahn's sustained before his separation, which required medical care both before and after the separation, knowing that the PHS denied that LTJG Kahn had such injury.

///

///

///

///

### *Prayer*

WHEREFORE, Plaintiff prays that the Court:

(1) set aside the decision of the BCCCR as acted upon by the reviewing official;

(2) set aside his termination;

(3) enter judgment for his back pay and allowances from the time of discharge;

(4) award reimbursement for payment for post-separation medical bills for care he would have received from the government had he not been improperly separated;

(5) award Plaintiff attorney's fees and costs expended in pursuit of this claim; and,

(6) that the Court grant such other relief as may be just and proper.

Dated: June 26, 2008

Respectfully submitted,

Steven H. Haney
Counsel of Record
Haney, Buchanan & Patterson, LLP
707 Wilshire Boulevard, 53rd Floor
Los Angeles, California 90017
(213) 228-6500 Tel
(213) 228-6501 Fax
shaney@hbplaw.com
*Attorneys for Plaintiff*